The first case is in re Synchrony Action before us, Stitching Depository vs. Synchrony Financial Councils. Good morning, may it please the court, Salvatore Graziano on behalf of the Plaintiffs APG Fund. The District Court's 12B6 dismissal of this curious class action was an error and should be reversed on de novo review. This is a very unique case. It's highly unusual to see the defendant's own statements basically demonstrate that they were being dishonest with investors. And I think being specific helps because the other side has said we've taken things out of context and we've ignored risk disclosures. But in fact, if you look at what the defendants in this case said in December of 2016, again in January of 2017, and again in February of 2017, they simply cannot be reconciled with what the defendants later started admitting in April of 2017 through the rest of the class period. So what do I mean, your honors? In December of 2016, the CFO of Synchrony said, importantly, we are not seeing anything right now that tells us to change our underwriting. We are always making tweaks and refinements, modifying a little bit, but we still really like how we're underwriting today. When you look at the returns, it's easy to underwrite to a positive return in this kind of environment between 600 and 625 FICO. That's as low as we go and we still really like the returns. So he said that on December 7th of 2016. Then he said on January 20th and February 27th of 2017 that the company continued to have consistent underwriting, hasn't really changed their underwriting over the past nine to 12 months, and the consistency is really important. It's really important in our business. It's really important to our retail partners. However, your honors, a few months later, when the bad returns started to hit Synchrony's financial books, for example, on November 14th of 2017, to jump to a specific one, the company saw the inflection point on credit for us and we went in right away as early as July, August 2016, and we started making changes. We tightened up around the dual card upgrades. These changes resulted in volume at FICO scores below 660 to decline by 13 percent. So we are talking about one of the things they respond to on those particular statements is that they provided the underlying data with regard to their underwriting approach in the November 3rd, 2016 investor presentation, February 27th investor presentation, the April 4, 2017 proxy statement that investors could look at the actual data to determine what impact there had been on their underwriting approach. What's your response to that? Absolutely, your honor, I'm aware of that argument and they do provide the data, but the data does not reflect the underwriting changes. If you examine the data both before and after they start making their admissions, this 13 percent decline in the FICO scores below 660 and then it becomes 15 percent the next quarter is just not visible in the data. We don't understand why that is, your honor, but the data does not reveal what they admit is a material decline first of 13 percent and then a 15 percent in this below 660 level. Counsel, if it was material, wouldn't it be reflected in the data that Judge Bianco is referring to? It was not reflected in the data prior to April of 2017. I don't mean that the numbers were reflected, but if it was material, it would be reflected in results and the results, as Judge Bianco points out, those were disclosed. It only began to be reflected starting in April of 2017 and thereafter. There is no reflection in the data prior to that time. There is no indication that the purchase volume is going to decline by 13 and then 15 percent. Also, your honors, it's not just the decline in purchase volume. We know that Walmart began pushing back. Half of Walmart's customer base is in this below 660, below prime level. Walmart started seeing the impact and they started talking to Sincrony for the first time in 20 years. They issued an RFP to put Sincrony's business out to bid. So, yes, your honor, Sincrony makes an argument, but the argument is not backed up by the data. If you look at the data in 2016, 2017 and 2018, for reasons we don't know and we don't have discovery, you don't even see this change in 2018. Well, after they said they were declined. So counsel, when they say that they received no pushback regarding their credit practices from retail partners, that was an outright deception, we argue. It was an outright deception, completely contradicted by the fact that we know they had multiple meetings in 2017 with Walmart. We know on October of 2017, Walmart, for the first time in 20 years, told Sincrony they were going to put its business out to bid. Then the CEO said in January of 2018, we are not getting pushback. They do compare it to other cases this court has decided, like Express Scripts, like American Express, but not in one of those cases where there was uncertainty as to whether or not it was. Was the context that that there was no pushback on the credit levels or that there was no pushback on whether Walmart was going to continue the relationship? The context is very specific and it's very much tied to what I'm talking about. So what happened was by this point in time, January of 2018, Sincrony has started to disclose their purchase volumes were going down in this below $660,000. The specific question the defendants were asked by JP Morgan is, are you getting any pushback as you tweak the underwriting and make less credit available to the sub $660,000 borrowers? I'm on page 884 in the appendix. Defending Keene, the CEO of Sincrony says, our partners are very cognizant of the fact that you don't want to put credit in the hands of people that can't handle it. The names are on their names are on the cards. We are not getting any pushback on credit. That is what she said. That was utterly false, Judge Pooler, when she said it. Based upon the full 2017 meeting that she had with Wal-Mart, correct, is that your argument? Based upon the full multiple 2017 meetings she had with Wal-Mart, based upon the fact that Wal-Mart told Sincrony they wanted more cards being issued to their customers. This is half of their customer base, based upon the fact that on October 27th of 2017, Wal-Mart, for the first time in 20 years, issued an RFP to multiple companies to bid for this business that Sincrony exclusively had from its inception as a public corporation. So where is that in the complaint? Because I was looking for that, that they knew they knew in the fall of 2017 that Wal-Mart was soliciting competitor bids. Where is that? It should be on A62, which is in paragraph 148. Yes, it's in paragraph 148 of the complaint appendix, page A62. And then in appendix A344, we actually have the RFP that Sincrony issued. I'm sorry, that Wal-Mart issued to multiple companies, including Sincrony. I have another question about their remarks in early in early 2017, that they were only making surgical tweaks to their credit standards. Isn't that misrepresentation at the time? I see my time is up. I can quickly answer. Please answer. Yes, that is. When you have a 13 percent and then a 15 percent reduction in purchase volume, surgical tweaks is just not an accurate statement as to what was happening here. Thank you, Your Honor. Thank you. You've reserved two minutes for rebuttal. Yes. We'll hear from the appellees. May I tell the court clerk to resend me the time of the for the attorneys arguing? Thank you. Go on. Good morning, counsel. Good morning, Your Honors. May it please the court, Victor Ho on behalf of Appellees and Sincrony. Judge Bianco, I think, focused on exactly the right thing when he posed to appellants. Wasn't all the objective, numerical, granular data disclosed to reasonable investors such that they could reach their own conclusions about what that data showed? That's exactly what happened in this case. And that is what Judge Bolden properly and appropriately relied upon as part of the total mix of information available to reasonable investors. What did that granular data? Mr. Ho, the 2018 earnings call in January with regard to the not getting any pushback. First of all, the district court did not address that in the opinion unless I missed it. So that was unaddressed. But they allege that in fall of 2017, Ms. King personally attended a meeting with Wal-Mart where Wal-Mart expressed significant pushback. So why is that not? It's not forward looking. It's not an opinion. That's a fact. Whether there was pushback or not. So why isn't that actionable? Sure. A couple of responses here. First off, Your Honor, with respect to whether or not Judge Bolden specifically addressed that. The fact of the matter is this is firmly within the category of statements that the judge did address as being too general and too vague to be material. I think Your Honor was on a panel very recently, the Skechers case, where in a footnote the court acknowledged that there were misstatements that were not specifically covered by the district court, but they were certainly covered by the analysis. And what's vague about whether there's pushback or not? The full context doesn't seem vague to me either. Sure, Your Honor. I think the full context of the quote that Ms. King was saying was our partners are very cognizant of the fact that they don't want to put credits in the hands of people who can't handle it. Their names are on the cards. So we work fairly closely with them, meaning our retail partners, and we're not getting pushback on credit. They work closely with us. So isn't it true that at that point already they knew that they were getting pushback from Walmart? And didn't she have a meeting with the head of Walmart before they issued that statement? Absolutely, Your Honor. And that's absolutely alleged in the complaint. And so why isn't that a misrepresentation? Because getting no pushback on credit in the context in which Ms. King delivered it was saying a more general point, which is at the end of the day, because of the way the RSAs, the agreements with the retailers, are structured, the interest of our partners, our retail partners in synchrony, are fully aligned. So even though they may want to drive sales on the front end and want to get credit for everybody. Counsel, realistically, how can those interests be fully aligned? Obviously, the retailer will want the credit to be as loose as possible, and the issuer is going to want it to be as tough as possible. So one thing the two views are not is aligned. And I appreciate Your Honor's point exactly, Judge Jacobs, and the reason why they're aligned is this. On the front end, you're right. There's a natural tension and reasonable investors understand that the retailer wants everybody to get credit. They want all their customers to spend money at their Walmarts. Fully understood. But on the back end, the way that they share profits under the RSA, as is fully disclosed, they don't get to benefit from that upside in the swing of sales if there's credit defaults, if people are not able to pay and they can't handle the credit that they're given. So they don't get the full benefit. In fact, that's what the Walmart complaint alleged, that I didn't get the benefit that I wanted. So, in fact, that's how that tension is resolved. But Your Honor is absolutely right. There is a natural tension. So isn't it true that the appellants have not been able to see the sealed Walmart complaint? And that's one of the things they seek in discovery, exactly what Walmart said. Isn't that true? It's true that they requested to see a copy of the unredacted version of the Walmart complaint after the motion to dismiss briefing. I think they understood, as we did, that these allegations were dead on arrival and they were looking for a way to resurrect their claims. At all times when they filed the complaint, Your Honor, they were aware of the fact that there was a fully unredacted copy. They did not seek to get the full copy of that complaint until after the motion dismissed. They certainly could have sought, as they did later, to intervene. Have you offered it to them in this interim period? What we have offered, Your Honor, is a couple of things. First off, all we made was arguments from the publicly available version. And just to show that the publicly available version of the complaint undermines their chief allegation in this complaint, which is we were too loose with underwriting some unspecified time period. And then at some point in time, we got too tight and therefore drove Walmart away. And all we did was show the publicly filed version, the redacted version that was redacted by Walmart because of commercial sensitivities. All we wanted to do was say that's inconsistent with the complaint that you cited in your complaint. That's all we did. And what we offered them is because they said, well, you have access to the unredacted. How do we know you're not telling mistruths and you're playing fast and loose with the facts? What we offered them in that instance is, look, we'll show you on a council to what what the unredacted portions are that pertain to this argument. So you can be sure we're not making misrepresentations. So we made that offer. We also made the offer to the court, the district court. Judge Bolton, we're happy to have you look at it in camera to make sure the council's not misrepresenting what's in the unredacted portion. Well, we didn't. On another question, can you tell me whether the changes you made in the complaint were not surgical or tweaks consistent with the changes you had made in the past? Yeah, absolutely, Your Honor. And I appreciate that question. I have a lot to say about it. So the fundamental premise of the amended complaint is somehow that these underwriting guidelines are static and they stay fixed in time. Every single public disclosure, by synchrony, about its underwriting practices, talks about how dynamic it is and how it changes from time to time at all times. So there's a front end piece where you sort of underwrite to give credit to people. You extend that credit. You monitor it throughout the life cycle of that relationship. So even throughout the credit relationship, you're tweaking it, modifying it all the time. That is the system that synchrony disclosed in every disclosure, including the one cited by the plaintiffs here. But if it's not a tweak, if it's a significant change in the approach, that could be a problem, both in terms of falsity and in terms of materiality. Mr. Graziano saying the data that was supplied didn't show at the time what was later determined to be a 13 to 15 percent drop in purchase sales. So why isn't that a problem? A couple of things, Your Honor. First off, in the context for the disclosure of why they made certain changes and tweaks to the disclosed dynamic underwriting process was an off-cycle disclosure in June of 2016. So this is synchrony telling the marketplace and reasonable investors, hey, we're seeing something here. We're seeing credit normalization. We're seeing people. We've been all enjoying this great, favorable credit environment. People are acting responsibly. But we're seeing a change in that behavior. We want. That's when you just call the tweaks. Exactly. Exactly. And the reason for that, Your Honor, is because it wasn't a wholesale change. And at all times, compared, for example, to the credit crisis in 2008, where there was massive changes in the way that they underwrote because of the credit crisis and the way that people handled credit, that was a massive change. And that was absolutely reflected in the data that was disclosed. The changes were the changes that were characterized as tweaks, changes of a of an order of magnitude consistent with what the company had been doing, say, over the last of the prior few years. I think the data shows and there's no argument very, very clearly, there's no argument that any of the data, the objective data that was disclosed at all times was in any way inaccurate. So, number one, there's no argument that the data is inaccurate. Number two, the FICO stratification show less than a two percent variance. So what that shows you is the overall credit picture for Synchrony did not change at all. It was very stable throughout the time period. Sometimes the data takes time to catch up to the changes that are made. Right. Absolutely. Your honor, because you're looking at the aggregate. But that's why there's a panoply of different metrics that are disclosed. So it's not just it's not our job. I just want to go back to the no pushback statement. And I know the district court didn't have to reach the enter based upon the rulings, but they alleged that this meeting with Walmart took place in the fall of 2017, where the pushback occurred. And then they alleged that there was a 10B5 plan that was implemented in November. So, you know, within weeks of that meeting, which led to Ms. King in early 2018, selling 22 percent of her shares, double selling 46 percent of the shares, Quinlan 48 percent of the shares. So why don't why doesn't the timing of the 10B5 plan and the substantial sales in terms of percentage supports the enter? So I think a couple of things, because, of course, it is a 10B51 plan. There's no allegation, no credible allegation that somehow Ms. King or anyone on the Synchrony leadership team that also entered into 10B51 plans knew that at that moment in time they were going to lose the Walmart account. What Synchrony had disclosed all along was that this is an incredibly competitive market. Mr. Graziano, I'm sorry. I'm sorry. Go ahead. I was going to say, Mr. Graziano pointed to paragraph 40, 148, 149 of the complaint where he says in 2017, it was known that they were soliciting competitors at that point, which is another indication of pushback, right? Yes. In fact, the whole disclosure that Synchrony makes is about how competitive there's nothing pushback is competition. It's saying I can get a better deal in this case from Capital One. That's pushback on credit. I can get more from somebody else than you. That's always pushback. And that was disclosed. The fact that we may be subject to RFPs was also disclosed. Reasonable investors knew there was no free lunch that Synchrony had to fight tooth and nail for business and would only make a deal if it made economic sense. You just said that you disclosed that there was pushback on credit, but that is exactly the opposite of what was said, that there was no pushback on credit. That's almost a quote. Your Honor, I was saying that what I was describing as the competitive marketplace, when other potential credit card issuers come in and compete against Synchrony, they're saying we can do better on credit than you. And so folks like Walmart, who are our savvy bargainers, will say, you know what, I can get a lot better deal from your competitors. That's pushback. Look, there isn't any question, but every time you have a business relationship, every time you have contract negotiations, you have pushback. That's what negotiations are. One person pushes this way, the other person pushes that way. But to say that there is no pushback on a particular subject seems to suggest that there's no expressed objection and unhappiness of a kind that's consequential. And I appreciate that, Your Honor, but this runs exactly into express scripts. So they're in express scripts, as all of this panel knows, deals exactly with this issue, the idea that in that case, which Mr. Graziano argued in the Second Circuit as well, saying, you know, even though that there was fierce and intense negotiations and there was definitely pushback happening in that relationship, and there was notices of fault, the fault in that case, and there was all sorts of allegations of bad faith, that even then, that wasn't actionable when the issuer was saying, you know what, we have a good relationship with our client. I think it was Anthem. It's going to be fine. You know, we value that relationship. Even though all this is happening behind the scenes, that did not amount to an actual misstatement. So all I'm saying is that what Ms. Keene is talking about, we're not getting pushback on credit. She's saying very generally at the end of this day, because of the way our incentives are aligned on the front end and the back end, we help them promote sales. We do in-sale promotions on the back end. They share in the economics or they don't if there's defaults. So ultimately, although it's true, there is this natural tension. The way we align those incentives is to stay on the back end. We share in the pain. It's not a one way street. So there's no pushback. Their names are, they don't want their people to default either at the end of the day. And that's all she was saying was nothing more significant than that. She was under me for interrupting. But I have a question on another topic. Why don't you consider the numerous former employees' statements regarding their personal experiences with the underwriting standards specific enough to meet the pleading standards in our circuit? So a couple of reasons, Your Honor, I think the vast majority of the former employees, the anonymous sources, give what this court has described as sort of soundbites that don't have sort of the connective tissue to actual changes in underwriting standards. But this is at the pleading stage. I mean, do we need the connective tissue at the pleading stage? They haven't had an ounce of discovery. That's the issue. Yes, Your Honor. And this court in ECA and numerous other cases have gone into looking at specific allegations made by former employees and the like to see if they amount to the specific type of allegation that would support the complaint under the standards of this court. I want to focus on FE9 because that's the only and I would say we've addressed this below. FE9 was an acquisitions manager. He said or she said that there were changes in the underwriting program. That's the only specific. And what FE9 admittedly in the complaint worked at was in the commercial division of the of the card business. That's less than two percent, two percent of the overall business. And what he described was not an underwriting change. It was that there would be a new cutoff in the way that those underwriting standards would be applied. So it's not even an underwriting guideline change. It's literally we're going to lower we're going to change the FICO cutoff for, you know, a co-borrower or the like. That is not a two percent change, a two percent slice of the business does not reflect the entire business. There's no allegation. He had full visibility. And recall that FE9 said in the complaint, I had a feeling I knew we were going to somehow lose Walmart. Well, no one told that to the synchrony management who traveled down to Bentonville, to Arkansas, to fight for it, to fight for that business all the way until the very end. They were fought until the end to try to make a deal to keep that value partner. But it's not at all cost. You don't just have customers to have customers. It has to make economic sense. And that's what we ask our executives and our companies to do, is to be stewards of the public trust, the shareholders trust. You don't just make deals that don't make economic sense. And that's what Margaret Keene, that's what Synchrony's executives said all along. We will work in good faith with our retail partners. But if they drive a bargain that doesn't make economic sense, we're not going to do it. And ultimately, that's what happened. And so your time is almost five, but we appreciate your forthcoming answers. We'll turn to Mr. Gargiano, who has retained two minutes. Thank you, your honors. As I started, this is a very unique case. It's really unusual to see this kind of conflict within defendants own statements to their investors in such a short period of time. I want to get to the data and I want to look at page 80 of the appendix to point out that on January 19th, the CFO said the changes they started making in June of 2016 led to a 13 percent decline in purchase volume for the below 660 FICO range. Then in April of 20, April 20 of 2018, they said it was a 15 percent decline. Those are material decline. Those are changes in the below 660 level. Right. All right. So that's what percentage of that is that of the whole of the whole book of business? Sure. That is first of all, that is half of Wal-Mart's customer base. That is the same book of business they were talking about exactly when they were asked about pushback. So they they said this is where we're focusing our changes. After the fact, they were asked, is that affecting your retail partners? And they then they denied it. So it is a material portion of their business. It led to material stock price declines when it was disclosed and the changes they were making. It also led them to be fired by Wal-Mart after 20 years. When you said it was disclosed, what was the triggering disclosure that they had lost Wal-Mart as a partner? There are multiple corrective disclosures. The first one is April of 2017, which way predates losing Wal-Mart. And that is when they start seeing the impact and they started admitting to the changes in the underwriting. And that was, I believe, a 16 percent decline. Then in 2018, there are a few disclosures about Wal-Mart that lead to additional declines. Their manipulation repeatedly of their 10B51 trading plans. It's very troubling in this case. They turn them on, they turn them off just to time this. And it is patently unfair to hear counsel again say what the Wal-Mart complaint shows. We don't have that complaint. We've asked for it repeatedly. We move to unseal it. The district court in Arkansas said they were using it as a shield and a sword. They named Wal-Mart as a company they were aligned with by name when they raised a billion dollars in an offering. Well, if if you made a motion to unseal it and the court in Arkansas thought you were right, why didn't the court in Arkansas unseal it? The court in Arkansas did unseal it. The Eighth Circuit stayed the unsealing until this district judge would rule on the motion to dismiss. And unfortunately, what happened in Connecticut in the district court was he granted the motion to dismiss and he denied the unsealing as moot at that point. And we don't think that was. And here we are, admittedly, talking about abuse of discretion. This is a different standard than the 12B6 issue, which is the primary issue before your honors. So we are saying the court abused its discretion by allowing them to use Wal-Mart as both a shield and a sword. But I recognize that's a different. Would you would you conceal that that when there's an order sealing something, a party cannot reveal it to somebody else? I mean, there has to be the order has to be lifted. If it's not lifted, I don't I don't understand how. Yeah, well, this is where it gets to you. This is where it gets a little messy. The order actually was lifted and deferred to our judge in Connecticut, and then he just declined to rule on it. But I understand what you're saying. But importantly, this 12B6 dismissal can and should be reversed. And that secondary issue doesn't even need to be reached by this court. I understand. But you're you're the one who's talking about it and making a big issue of the fact that they haven't revealed to you something that if they revealed would be contempt. What I'm saying is they should not be allowed to argue what is in a sealed complaint and using that sealed complaint as both a shield and a sword. That is my problem. Arguing to the extent that it is unsealed and to the extent you have access. But I don't take it. Well, I heard counsel say what the Wal-Mart complaint alleged, and I don't know what the Wal-Mart complaint alleged. And frankly, the little of it that I see is not consistent with the argument they've been making. I really appreciate the court's time. I'm not sure if there are further questions, but I see I'm out of time. Thank you, counsel. Thank you for a very good argument. We'll reserve decision.